TRACY WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
RICHARD E. ROBINSON (Cal. Bar No. 90840)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0713
    Facsimile: (213) 894-6269
    E-mail:    Richard.Robinson@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
WILLIAM E. JOHNSTON (D.C. Bar No. 1030662)
Assistant Chief, Fraud Section
Criminal Division
United States Department of Justice
    1400 New York Avenue, NW
    Washington, DC 20005
    Phone: (202)514-0687
    Email: william.johnston4@usdoj.gov

**FILED**
CLERK, U.S. DISTRICT COURT

**2/25/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>HASSAN KANYIKE,<br><br>    Defendant. | No. CR 2:21-cr-00081-VAP<br><br>PLEA AGREEMENT FOR DEFENDANT HASSAN KANYIKE |

     1.   This constitutes the plea agreement between HASSAN KANYIKE ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") and the Fraud Section of the Criminal Division of the U.S. Department of Justice (collectively, the "Government") in the Government's loan fraud investigation of

defendant.  This agreement is limited to the USAO and the Fraud Section and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the Government and provided by the Court, appear and plead guilty to a one-count information, in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Wire Fraud in violation of 18 U.S.C. § 1343.

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Agree that all court appearances, including his change of plea hearing and sentencing hearing, may proceed by video-teleconference ("VTC") or telephone, if VTC is not reasonably available, so long as such appearances are authorized by Orders of the Chief Judge Nos. 20-043 and 20-186, or another order, rule, or statute.  Defendant understands that, under the United States Constitution, the United States Code, and the Federal Rules of Criminal Procedure (including Rules 11, 32, and 43), he may have the right to be physically present at these hearings.  Defendant understands that right and, after consulting with counsel, voluntarily agrees to waive it and to proceed remotely.  Defense

1    counsel also joins in this consent, agreement, and waiver.

2    Specifically, this agreement includes, but is not limited to, the

3    following:

4               i.   Defendant consents under Federal Rules of

5    Criminal Procedure 5(f) and 10(c) and Section 15002(b) of the CARES

6    Act to proceed with his initial appearance and arraignment by VTC or

7    telephone, if VTC is not reasonably available.

8               ii.  Defendant consents under Section 15002(b) of the

9    CARES Act to proceed with his waiver of indictment, under Federal

10   Rule of Criminal Procedure 7(b), by VTC or telephone, if VTC is not

11   reasonably available.

12              iii. Defendant consents under Section 15002(b) of the

13   CARES Act to proceed with his change of plea hearing by VTC or

14   telephone, if VTC is not reasonably available.

15              iv.  Defendant consents under Section 15002(b) of the

16   CARES Act to proceed with his sentencing hearing by VTC or telephone,

17   if VTC is not reasonably available.

18              v.   Defendant consents under 18 U.S.C. § 3148 and

19   Section 15002(b) of the CARES Act to proceed with any hearing

20   regarding alleged violations of the conditions of pretrial release by

21   VTC or telephone, if VTC is not reasonably available.

22         f.   Not commit any crime or any act constituting

23   obstruction of justice; however, offenses that would be excluded for

24   sentencing purposes under United States Sentencing Guidelines

25   ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the

26   scope of this agreement.

27         g.   Be truthful at all times with the United States

28   Probation and Pretrial Services Office and the Court.

3

1        h.   Pay the applicable special assessment at or before the

2  time of sentencing unless defendant has demonstrated a lack of

3  ability to pay such assessments.

4        i.   At or before the time of sentencing, satisfy any and

5  all restitution and fine obligations based on ability to pay by

6  delivering a certified check or money order to the Fiscal Clerk of

7  the Court in the amount of $1,302,550, to be held until the date of

8  sentencing and, thereafter, applied to satisfy defendant's

9  restitution and fine balances.  Payments may be made to the Clerk,

10  United States District Court, Fiscal Department, 255 East Temple

11  Street, 11th Floor, Los Angeles, California 90012.

12        j.   Ability to pay shall be assessed based on the

13  Financial Disclosure Statement, referenced below, and all other

14  relevant information relating to ability to pay.  Defendant will use

15  his reasonable best efforts to repatriate any funds defendant caused

16  to be transferred to the Republic of Uganda from a bank account he

17  maintained at JPMorgan Chase Bank in the name of Falcon Motors Inc.,

18  and defendant will cause such repatriated funds to be delivered by

19  certified check or money order to the Fiscal Clerk of the Court, to

20  be applied to satisfy defendant's restitution and fine balances.

21        k.   Complete the Financial Disclosure Statement on a form

22  provided by the Government and, within 30 days of defendant's entry

23  of a guilty plea, deliver the signed and dated statement, along with

24  all of the documents requested therein, to the Government by either

25  email at usacac.FinLit@usdoj.gov (preferred) or mail to the USAO

26  Financial Litigation Section at 300 N. Los Angeles St., Suite 7516,

27  Los Angeles, CA 90012.

28        l.   Authorize the Government to obtain a credit report

4

1  upon returning a signed copy of this plea agreement.

2         m.   Consent to the Government inspecting and copying all

3  of defendant's financial documents and financial information held by

4  the United States Probation and Pretrial Services Office.

5     3.   Defendant further agrees:

6         a.   To forfeit all right, title, and interest in and to

7  any and all monies, properties, and/or assets of any kind, derived

8  from or acquired as a result of the illegal activity to which

9  defendant is pleading guilty, specifically including, but not limited

10  to, the following: $75,762.51, seized pursuant to a seizure warrant

11  executed on or about December 23, 2020, against funds in a bank

12  account maintained at JPMorgan Chase Bank in the name of Falcon

13  Motors Inc. (collectively, the "Forfeitable Assets").

14         b.   To the Court's entry of an order of forfeiture at or

15  before sentencing with respect to the Forfeitable Assets and to the

16  forfeiture of the assets.

17         c.   To take whatever steps are necessary to pass to the

18  United States clear title to the Forfeitable Assets, including,

19  without limitation, the execution of a consent decree of forfeiture

20  and the completing of any other legal documents required for the

21  transfer of title to the United States.

22         d.   Not to contest any administrative forfeiture

23  proceedings or civil judicial proceedings commenced against the

24  Forfeitable Assets.  If defendant submitted a claim and/or petition

25  for remission for all or part of the Forfeitable Assets on behalf of

26  himself or any other individual or entity, defendant shall and hereby

27  does withdraw any such claims or petitions, and further agrees to

28

waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Assets.

        e.   Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Assets.

        f.   Not to claim that reasonable cause to seize the Forfeitable Assets was lacking.

        g.   To prevent the transfer, sale, destruction, or loss of any and all assets described above to the extent defendant has the ability to do so.

        h.   To fill out and deliver to the Government a completed financial statement listing defendant's assets on a form provided by the Government.

        i.   That forfeiture of Forfeitable Assets shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

    4.   With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Assets in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that forfeiture of the Forfeitable Assets is part of the sentence that may be imposed in this case and waives any failure by the Court

to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

<u>THE GOVERNMENT'S OBLIGATIONS</u>

5.   The Government agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d.   Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.

e.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. §§ 1028A, 1014, 1341, 1343, 1344, 1349, 1956, 1957, and 15 U.S.C. § 645 arising out of defendant's conduct described in the agreed-to factual basis set forth below.  Defendant understands that the Government is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety

1   and extent of any departure from that range, and the sentence to be

2   imposed after consideration of the Sentencing Guidelines and all

3   other relevant factors under 18 U.S.C. § 3553(a).

4                           NATURE OF THE OFFENSE

5       6.   Defendant understands that for defendant to be guilty of

6   the crime charged in the information, that is, wire fraud, in

7   violation of Title 18, United States Code, Section 1343, the

8   following must be true:

9       First, defendant knowingly devised a scheme or plan to defraud,

10  or a scheme or plan for obtaining money or property by means of false

11  or fraudulent pretenses, representations, promises or omitted facts;

12      Second, the statements made or facts omitted as part of the

13  scheme were material; that is, they had a natural tendency to

14  influence, or were capable of influencing, a person to part with

15  money or property;

16      Third, defendant acted with intent to defraud; that is, the

17  intent to deceive and cheat; and

18      Fourth, defendant used, or caused to be used, an interstate wire

19  communication to carry out or attempt to carry out an essential part

20  of the scheme.

21                       PENALTIES AND RESTIUTION

22      7.   Defendant understands that the statutory maximum sentence

23  that the Court can impose for a violation of Title 18, United States

24  Code, Section 1343, is: 20 years' imprisonment; a three-year period

25  of supervised release; a fine of $250,000 or twice the gross gain or

26  gross loss resulting from the offense, whichever is greatest; and a

27  mandatory special assessment of $100.

28

8.   Defendant understands that defendant will be required to pay full restitution to the victim of the offense to which defendant is pleading guilty.  Defendant agrees that, in return for the Government's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those charges.  The parties currently believe that the applicable amount of restitution is approximately $1,302,550 but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

9.   Defendant agrees that any and all fines and/or restitution ordered by the Court will be due immediately.  The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

10.  The Court will also order forfeiture of the property listed in count one of the information pursuant to 18 U.S.C. § 982 or substitute assets up to the value of that property.

11.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

12.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

13.   Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future.

10

1  Defendant understands that while there may be arguments that
2  defendant can raise in immigration proceedings to avoid or delay
3  removal, removal is presumptively mandatory and a virtual certainty
4  in this case.  Defendant further understands that removal and
5  immigration consequences are the subject of a separate proceeding and
6  that no one, including his attorney or the Court, can predict to an
7  absolute certainty the effect of his conviction on his immigration
8  status.  Defendant nevertheless affirms that he wants to plead guilty
9  regardless of any immigration consequences that his plea may entail,
10  even if the consequence is automatic removal from the United States.

11                              FACTUAL BASIS

12      14.  Defendant admits that defendant is, in fact, guilty of the
13  offense to which defendant is agreeing to plead guilty.  Defendant
14  and the Government agree to the statement of facts provided in
15  Exhibit B attached to this agreement, and agree that this statement
16  of facts is sufficient to support a plea of guilty to the charge
17  described in this agreement and to establish the Sentencing
18  Guidelines factors set forth in paragraph 16 below but is not meant
19  to be a complete recitation of all facts relevant to the underlying
20  criminal conduct or all facts known to either party that relate to
21  that conduct.

22                            SENTENCING FACTORS

23      15.  Defendant understands that in determining defendant's
24  sentence the Court is required to calculate the applicable Sentencing
25  Guidelines range and to consider that range, possible departures
26  under the Sentencing Guidelines, and the other sentencing factors set
27  forth in 18 U.S.C. § 3553(a).  Defendant understands that the
28  Sentencing Guidelines are advisory only, that defendant cannot have

any expectation of receiving a sentence within the calculated

Sentencing Guidelines range, and that after considering the

Sentencing Guidelines and the other § 3553(a) factors, the Court will

be free to exercise its discretion to impose any sentence it finds

appropriate up to the maximum set by statute for the crime of

conviction.

16.   Defendant and the Government agree to the following

applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level: | | 7 | [U.S.S.G. §2B1.1(a)] |
| Specific Offense Characteristics: | | | |
| Loss more than $1,500,000, not more than $3,500,000 | | +16 | [U.S.S.G. §2B1.1(b)(1)(I)] |
| Acceptance of Responsibility: | | -3 | [U.S.S.G. § 3E1.1(b)] |
| Total Offense Level: | | 20 | |

The Government will agree to a two-level downward adjustment for

acceptance of responsibility (and, if applicable, move for an

additional one-level downward adjustment under U.S.S.G. § 3E1.1(b))

only if the conditions set forth in paragraph 5.c are met and if

defendant has not committed, and refrains from committing, acts

constituting obstruction of justice within the meaning of U.S.S.G. §

3C1.1, as discussed below.  Subject to paragraph 29 below, defendant

and the Government agree not to seek, argue, or suggest in any way,

either orally or in writing, that any other specific offense

characteristics, adjustments, or departures relating to the offense

level be imposed.  Defendant agrees, however, that if, after signing

this agreement but prior to sentencing, defendant were to commit an

act, or the Government were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the Government, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the Government would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.

17.   Defendant and the Government reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

18.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

20.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands, having been fully advised by defendant's counsel, that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, any defense, claim or argument defendant could raise based on lack of venue with respect to the offense to which defendant is pleading guilty, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

21.   Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, provided it is no more than the high-end of the Sentencing Guidelines range calculated by the Court; (c) the fine

imposed by the Court, provided it is within the statutory maximum;
(d) to the extent permitted by law, the constitutionality or legality
of defendant's sentence, provided it is within the statutory maximum;
(e) the amount and terms of any restitution order, provided it
requires payment of no more than $1,302,550; (f) the term of
probation or supervised release imposed by the Court, provided it is
within the statutory maximum; and (g) any of the following conditions
of probation or supervised release imposed by the Court: the
conditions set forth in Amended General Order 20-04 of this Court;
the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and
3583(d); and the alcohol and drug use conditions authorized by 18
U.S.C. § 3563(b)(7).

22.  Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, that newly discovered evidence purportedly supports defendant's innocence, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

23.  The Government agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the Government gives up its right to appeal any portion of the sentence, with the exception that the Government reserves the right to appeal

15

the amount of restitution ordered if that amount is less than $1,302,550.

### RESULT OF WITHDRAWAL OF GUILTY PLEA

24.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the Government will be relieved of all of its obligations under this agreement; and (b) should the Government choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

### EFFECTIVE DATE OF AGREEMENT

25.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

### BREACH OF AGREEMENT

26.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the

16

Government may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the Government to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the Government in writing.  If the Government declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the Government will be relieved of all its obligations under this agreement.

27.  Following the Court's finding of a knowing breach of this agreement by defendant, should the Government choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.  Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.  Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under

17

1  the United States Constitution, any statute, Rule 410 of the Federal

2  Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

3  Procedure, or any other federal rule, that the statements or any

4  evidence derived from the statements should be suppressed or are

5  inadmissible.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

8      28.  Defendant understands that the Court and the United States

9  Probation and Pretrial Services Office are not parties to this

10 agreement and need not accept any of the Government's sentencing

11 recommendations or the parties' agreements to facts or sentencing

12 factors.

13     29.  Defendant understands that both defendant and the

14 Government are free to: (a) supplement the facts by supplying

15 relevant information to the United States Probation and Pretrial

16 Services Office and the Court, (b) correct any and all factual

17 misstatements relating to the Court's Sentencing Guidelines

18 calculations and determination of sentence, and (c) argue on appeal

19 and collateral review that the Court's Sentencing Guidelines

20 calculations and the sentence it chooses to impose are not error,

21 although each party agrees to maintain its view that the calculations

22 in paragraph 16 are consistent with the facts of this case.  While

23 this paragraph permits both the Government and defendant to submit

24 full and complete factual information to the United States Probation

25 and Pretrial Services Office and the Court, even if that factual

26 information may be viewed as inconsistent with the facts agreed to in

27 this agreement, this paragraph does not affect defendant's and the

28

Government's obligations not to contest the facts agreed to in this agreement.

30.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.   Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

31.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the Government and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

32.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the

///

///

///

1  entire agreement had been read into the record of the proceeding.

2  AGREED AND ACCEPTED

3  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
4  CALIFORNIA

5  TRACY WILKISON
   Acting United States Attorney

6

7  *[signature]*

8  _____          2/22/2021
   RICHARD E. ROBINSON                     Date
9  Assistant United States Attorney

10 WILLIAM E. JOHNSTON
   Assistant Chief, Fraud Section
11 United States Department of Justice

12

13 _____          02/22/2021
   HASSAN KANYIKE                          Date
14 Defendant

15

16 _____          7/22/21
   VICTOR SHERMAN                          Date
17 Attorney for Defendant
   HASSAN KANYIKE

18

19              CERTIFICATION OF DEFENDANT

20      I have read this agreement in its entirety.  I have had enough

21 time to review and consider this agreement, and I have carefully and

22 thoroughly discussed every part of it with my attorney.  I understand

23 the terms of this agreement, and I voluntarily agree to those terms.

24 I have discussed the evidence with my attorney, and my attorney has

25 advised me of my rights, of possible pretrial motions that might be

26 filed, of possible defenses that might be asserted either prior to or

27 at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

28 of relevant Sentencing Guidelines provisions, and of the consequences

                              20

1  of entering into this agreement.  No promises, inducements, or

2  representations of any kind have been made to me other than those

3  contained in this agreement.  No one has threatened or forced me in

4  any way to enter into this agreement.  I am satisfied with the

5  representation of my attorney in this matter, and I am pleading

6  guilty because I am guilty of the charge and wish to take advantage

7  of the promises set forth in this agreement, and not for any other

8  reason.

9  _____      02/02/2021

10  HASSAN KANYIKE              Date
     Defendant

12             CERTIFICATION OF DEFENDANT'S ATTORNEY

13     I am HASSAN KANYIKE's attorney.  I have carefully and thoroughly

14  discussed every part of this agreement with my client.  Further, I

15  have fully advised my client of his rights, of possible pretrial

16  motions that might be filed, of possible defenses that might be

17  asserted either prior to or at trial, of the sentencing factors set

18  forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

19  provisions, and of the consequences of entering into this agreement.

20  To my knowledge: no promises, inducements, or representations of any

21  kind have been made to my client other than those contained in this

22  agreement; no one has threatened or forced my client in any way to

23  enter into this agreement; my client's decision to enter into this

24  agreement is an informed and voluntary one; and the factual basis set

25  forth in this agreement is sufficient to support my client's entry of

26  ///

27  ///

28  ///

a guilty plea pursuant to this agreement.

_____     _____
VICTOR SHERMAN                      Date
Attorney for Defendant
HASSAN KANYIKE

**EXHIBIT A TO PLEA AGREEMENT OF DEFENDANT HASSAN KANYIKE**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. |
|     Plaintiff, | I N F O R M A T I O N |
|     v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 982: Criminal Forfeiture] |
| HASSAN KANYIKE, | |
|     Defendant. | |

The Acting United States Attorney charges:

[18 U.S.C. § 1343]

A.  INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Defendant and the Relevant Entities

1.  Defendant HASSAN KANYIKE, who was born in the Republic of Uganda, resided in Newhall, California, within the Central District of California.

2.  Defendant KANYIKE was Chief Executive officer and Chief Financial officer of Falcon Motors Inc. ("Falcon Motors"), a California corporation formed in 2018, with its business address in Los Angeles, California, within the Central District of California. Defendant KANYIKE operated Falcon Motors as a used car dealership.

3.    Defendant KANYIKE was also the sole proprietor of HK Development International ("HK Development"), a purported business located at the same address as defendant KANYIKE's Newhall residence.

4.    Defendant KANYIKE controlled a business checking account in the name of Falcon Motors, maintained at a branch of "Bank A," within the Central District of California ("Falcon Motors Bank A Account").

5.    Defendant KANYIKE also controlled a personal checking account in his own name, maintained at a branch of "Bank B," within the Central District of California ("defendant's Bank B Account").

The Paycheck Protection Program

6.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  PPP loan proceeds were required to be used by the business to pay certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities.

7.    In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the applicant business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  Such certifications required the applicant to affirm that "The [PPP loan]

funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments," and that the "loan proceeds will be used only for business-related purposes as specified in the loan application" and consistent with the PPP rules.  The authorized representative of the applicant was also required to certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in material respects," and "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

8.   In the PPP loan application, the applicant was required to state, among other things, the business's: (a) average monthly payroll expenses and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

9.   A small business's PPP loan application was received and processed by a participating lender approved by the Small Business Administration ("SBA").  If a PPP loan application was approved, the participating lender would fund the PPP loan using its own monies, which were guaranteed by the SBA.

The EIDL Program

10.   The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs to eligible small

3

businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

11.   In order to obtain an EIDL, a qualifying small business had to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period ran from January 31, 2019, to January 31, 2020.  The applicant had to also certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

12.   EIDL applications were submitted directly to the SBA.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and costs of goods, as described above.  Any funds issued under an EIDL were issued directly by the SBA.  EIDL funds could be used for payroll expense, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a PPP loan, the EIDL proceeds could be used for the same purpose as the PPP funds.

SBA-Approved Lender

13.   "Bank C" was a financial institution based in Salt Lake City, Utah, and was an SBA-approved participating lender of PPP loans.

B.   THE SCHEME TO DEFRAUD

14.   Beginning in or about April 2020, and continuing through in or about June 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendant KANYIKE, together

4

1   with others known and unknown to the Acting United States Attorney,
2   knowingly and with intent to defraud, devised, participated in,
3   executed, and attempted to execute a scheme to defraud Bank C, the
4   SBA, and other SBA-approved lenders as to material matters, and to
5   obtain money and property owned by and in the custody and control of
6   Bank C, the SBA, and other SBA-approved lenders by means of material
7   false and fraudulent pretenses, representations, and promises, and
8   the concealment of material facts.

9       15.   The fraudulent scheme operated and was carried out, in
10  substance, as follows:

11          a.   During April, May, and June 2020, defendant KANYIKE
12  submitted, and caused to be submitted, eight false and fraudulent PPP
13  and EIDL loan applications to Bank C, the SBA, and four other SBA-
14  approved lenders on behalf of Falcon Motors and HK Development.  More
15  specifically, in April 2020, defendant KANYIKE submitted four
16  separate PPP loan applications for Falcon Motors to Bank C and three
17  other SBA-approved lenders, one PPP loan application for HK
18  Development to Bank C, and one EIDL application for Falcon Motors to
19  the SBA.  In May 2020, defendant KANYIKE submitted a PPP loan
20  application for Falcon Motors to another SBA-approved lender.  In
21  June 2020, defendant KANYIKE submitted an EIDL application for HK
22  Development to the SBA.

23          b.   Defendant KANYIKE certified in the PPP loan
24  applications that defendant KANYIKE, as authorized representative of
25  Falcon Motors and HK Development, knew and understood the terms and
26  rules of the PPP loan program, which provided that PPP loan proceeds
27  were to be used by the recipient to pay only certain authorized
28  business expenses, such as payroll, mortgage interest, lease, and

1 | utilities.  Instead of using PPP loan proceeds for their stated and

2 | authorized business purposes consistent with PPP rules, defendant

3 | KANYIKE knowingly misapplied and used a substantial portion of the

4 | PPP loan proceeds for his own personal benefit, including sending

5 | hundreds of thousands of dollars of PPP loan proceeds to Uganda.

6 |      c.   In support of the PPP loan applications, defendant

7 | KANYIKE misrepresented and inflated the number of employees and

8 | payroll for Falcon Motors and HK Development, and provided fake

9 | supporting payroll tax records, payroll registers, and bank records.

10 |      d.   Defendant KANYIKE certified in the EIDL applications

11 | that all representations in the applications, including supplementary

12 | submissions, were true and correct, and offered to induce the SBA to

13 | make the loans.  In support of the EIDL applications, defendant

14 | KANYIKE misrepresented and inflated the total revenue and costs of

15 | goods sold for both Falcon Motors and HK Development during the

16 | relevant period (January 31, 2019, to January 31, 2020).

17 |      e.   Defendant KANYIKE caused the Bank C, the SBA, and the

18 | other SBA-approved lenders to pay or transfer the fraudulently

19 | obtained PPP loans and EIDL funds for Falcon Motors and HK

20 | Development, respectively, into the Falcon Motors Bank A Account and

21 | defendant's Bank B Account.

22 |     16.  To carry out the fraudulent scheme, in April 2020,

23 | defendant KANYIKE submitted, and caused to be submitted, to Bank C a

24 | loan application dated April 30, 2020, signed by defendant KANYIKE,

25 | and supporting documentation, for a PPP loan in the amount of

26 | $420,000 for Falcon Motors (the "Falcon Motors PPP Loan

27 | Application"), for the stated purpose of paying payroll for Falcon

28 | Motors.  In the Falcon Motors PPP Loan Application, defendant KANYIKE

knowingly made the following false and fraudulent statements, among others:

      a.   Defendant KANYIKE falsely represented that applicant Falcon Motors had 26 employees and an average monthly payroll of $168,000, when, in fact, as defendant KANYIKE then knew, Falcon Motors had substantially fewer employees and a substantially lower payroll;

      b.   Defendant KANYIKE falsely represented that applicant Falcon Motors was in operation as of February 15, 2020, and had employees for whom it paid salaries and payroll taxes using Employer Identification Number ("EIN") 85-080XXXX, when, in fact, as defendant KANYIKE then knew, EIN 85-080XXXX was not issued by the IRS until April 23, 2020, and the purported IRS Form SS-4 assigning EIN 85-080XXXX to Falcon Motors that defendant KANYIKE submitted to Bank C was altered to show a false EIN issue date of April 23, 2018;

      c.   Defendant KANYIKE falsely represented that applicant Falcon Motors with EIN 85-080XXXX had paid the substantial payroll expenses shown in the purported IRS Form 940 annual tax return for 2019 and Form 941 tax return for the first quarter of 2020, which defendant KANYIKE submitted to Bank C as proof of payroll expenses paid by Falcon Motors, when, in fact, as defendant KANYIKE then knew, Falcon Motors had not paid such payroll expenses, and these tax return forms were fabricated and never filed with the IRS;

      d.   Defendant KANYIKE falsely certified that Falcon Motors would not receive another loan under the PPP during 2020, when, in fact, as defendant KANYIKE then knew and concealed from Bank C, at the time of the Falcon Motors PPP Application to Bank C, defendant

7

1    KANYIKE had previously submitted an active PPP application for Falcon

2    Motors to another SBA-approved lender; and

3            e.   Defendant KANYIKE falsely certified that the funds

4    sought in the Falcon Motors PPP Application would be used to retain

5    workers and maintain payroll or make mortgage-interest payments,

6    lease payments, and utility payments, when, in fact, as defendant

7    KANYIKE then knew, he intended to misapply and use the funds for

8    purposes unrelated to Falcon Motors, including sending a substantial

9    portion of the funds to Uganda.

10           17.  In reliance on defendant KANYIKE's material false and

11   fraudulent statements and his concealment of material facts, Bank C

12   approved and funded the Falcon Motors PPP Loan Application, and

13   thereafter transferred approximately $420,000 in loan proceeds by

14   interstate wire to the Falcon Motors Bank Account A.

15           18.  In total, as a result of the false and fraudulent PPP loan

16   and EIDL applications that defendant KANYIKE submitted to Bank C, the

17   SBA, and other SBA-approved lenders, defendant KANYIKE fraudulently

18   obtained approximately $1,302,550 in PPP loans and EIDL proceeds,

19   which defendant KANYIKE caused to be deposited into the Falcon Motors

20   Bank A Account and defendant's Bank B Account.

21   C.   USE OF AN INTERSTATE WIRE

22           19.  On or about May 8, 2020, in Los Angeles County, within the

23   Central District of California, and elsewhere, for the purpose of

24   executing the above-described scheme to defraud, defendant KANYIKE

25   caused others to transmit, by means of wire communications in

26   interstate commerce, approximately $420,000 from an account

27   maintained by Bank C in Salt Lake City, Utah, to the Falcon Motors

28   Bank A Account.

8

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of the defendant KANYIKE's conviction of the offense set forth in this Information.

2.    Defendant KANYIKE, if so convicted, shall forfeit to the United States of America the following:

        (a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense including, but not limited to, approximately $75,762.51 in funds seized from a JPMorgan Chase Bank account in the name of Falcon Motors, Inc.; and

        (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), defendant KANYIKE, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant KANYIKE, the property described in the preceding paragraph, or any portion thereof:

(a) cannot be located upon the exercise of due diligence; (b) has

9

1  been transferred, sold to, or deposited with a third party; (c) has

2  been placed beyond the jurisdiction of the court; (d) has been

3  substantially diminished in value; or (e) has been commingled with

4  other property that cannot be divided without difficulty.

TRACY WILKISON
Acting United States Attorney

DANIEL S. KAHN
Acting Chief, Fraud Section
United States Department of Justice


BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

RICHARD E. ROBINSON
Assistant United States Attorney
Major Frauds Section

WILLIAM E. JOHNSTON
Assistant Chief, Fraud Section
United States Department of Justice

**EXHIBIT B TO PLEA AGREEMENT**
**STATEMENT OF FACTS IN SUPPORT OF DEFENDANT**
**HASSAN KANYIKE'S PLEA AGREEMENT AND INFORMATION**

Defendant HASSAN KANYIKE represents and admits that the following facts are true:

Defendant and the Relevant Entities:

1.   At all relevant times:

a.   Defendant HASSAN KANYIKE ("defendant"), who was born in the Republic of Uganda, resided in Newhall, California.

b.   Defendant was the Chief Executive Officer and Chief Financial Officer of Falcon Motors Inc. ("Falcon Motors"), a California corporation formed in 2018.  Defendant operated Falcon Motors as a used car dealership, with its business address at 7905 Van Nuys Boulevard in the Los Angeles, California neighborhood of Panorama City 91402.

c.   Defendant was the sole proprietor of HK Development International ("HK Development"), a purported business located at the same address as defendant's Newhall residence.

d.   Defendant controlled a business checking account in the name of "Falcon Motors Inc.," maintained at a branch of Bank A, with an account number ending 0153, within the Central District of California (the "Falcon Motors Bank A Account").

e.   Defendant controlled a personal checking account in his own name, maintained at a branch of Bank B, with an account number ending in 1894, within the Central District of California (the "defendant's Bank B Account").

1

H.K.

The Paycheck Protection Program

         f.    The Coronavirus Aid, Relief, and Economic
Security ("CARES") Act was a federal law enacted in or about
March 2020 that was designed to provide emergency financial
assistance to Americans suffering economic harm as a result of
the COVID-19 pandemic.  One form of assistance provided by the
CARES Act was the authorization of United States taxpayer funds
in forgivable loans to small businesses for job retention and
certain other expenses, through a program referred to as the
Paycheck Protection Program ("PPP").  PPP loan proceeds were
required to be used by the business to pay certain permissible
expenses: payroll costs, interest on mortgages, rent, and
utilities.

         g.    In order to obtain a PPP loan, a qualifying
business was required to submit a PPP loan application signed by
an authorized representative of the business.  The PPP loan
application required the applicant business (through its
authorized representative) to acknowledge the program rules and
make certain affirmative certifications in order to be eligible
to obtain the PPP loan.  Such certifications required the
applicant to affirm that "The [PPP loan] funds will be used to
retain workers and maintain payroll or make mortgage interest
payments, lease payments, and utility payments," and that the
"loan proceeds will be used only for business-related purposes
as specified in the loan application" and consistent with the
PPP rules.  The authorized representative of the applicant was

H.K.

also required to certify that "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in material respects," and "I understand "loan proceeds will be used only for business-related purposes as specified in the loan application."  The authorized representative of the applicant was also required to certify that "I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

h.   In the PPP loan application, the applicant was required to state, among other things, the business's: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, the applicant was required to provide documentation showing its payroll expenses.

i.   A small business's PPP loan application was received and processed by a participating lender approved by the Small Business Administration ("SBA").  If a PPP loan application was approved, the participating lender would fund the PPP loan using its own monies, which were guaranteed by the SBA.

The EIDL Program

j.   The SBA's Economic Injury Disaster Loan ("EIDL") program provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared

3

H.K.

disasters.   The CARES Act authorized the SBA to provide EIDLs to
eligible small businesses experiencing substantial financial
disruption due to the COVID-19 pandemic.

k.   In order to obtain an EIDL, a qualifying small
business had to submit an application to the SBA and provide
information about its operations, such as the number of
employees, gross revenues for the 12-month period preceding the
disaster, and cost of goods sold in the 12-month period
preceding the disaster.   In the case of EIDLs for COVID-19
relief, the 12-month period ran from January 31, 2019, to
January 31, 2020.   The applicant had to also certify that all of
the information in the application was true and correct to the
best of the applicant's knowledge.

l.   EIDL applications were submitted directly to the
SBA.   The amount of the loan, if the application was approved,
was determined based, in part, on the information provided by
the applicant about employment, revenue, and costs of goods, as
described above.   Any funds issued under an EIDL were issued
directly by the SBA.   EIDL funds could be used for payroll
expense, sick leave, production costs, and business obligations,
such as debts, rent, and mortgage payments.   If the applicant
also obtained a PPP loan, the EIDL proceeds could be used for
the same purpose as the PPP funds.

H.K.

SBA-Approved Lenders

      m.   "Bank C" was a financial institution based in Salt Lake City, Utah, and was an SBA-approved participating lender of PPP loans.

      n.   "Bank D" was a financial institution based in West Reading, Pennsylvania, and was an SBA-approved participating lender of PPP loans.

      o.   "Bank E" was a financial institution based in Oakland, California, and was an SBA-approved participating lender of PPP loans.

      p.   "Lender 1" was a non-bank finance company based in Los Angeles, California, and was an SBA-approved participating lender of PPP loans.

The Scheme to Defraud

    2.   Beginning in or about April 2020, and continuing through in or about June 2020, in Los Angeles County, within the Central District of California, defendant knowingly and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme to defraud Bank C, Bank D, Bank E, Lender 1, and the SBA, as to material matters, and to obtain money and property owned by and in the custody and control of Bank C, Bank D, Bank E, Lender 1, and the SBA, by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

    3.   During April, May, and June 2020, defendant submitted eight false and fraudulent applications and supporting documents

H.K.

in the names of "Falcon Motors" and "HK Development" to obtain
PPP loans and EIDL proceeds from Bank A, Bank C, Bank D, Bank E,
Lender 1, and the SBA.  In all, and as further detailed below,
defendant fraudulently obtained a total of approximately
$1,302,550: (a) $903,800 in PPP funding for Falcon Motors; (b)
$98,750 in PPP funding for HK Development; (c) $150,000 in EIDL
proceeds for Falcon Motors; and (d) $150,000 in EIDL proceeds
for HK Development.

<u>Funded Falcon Motors PPP Loan Applications</u>

    4.   In April and May 2020, defendant submitted five
separate false and fraudulent PPP applications on behalf of
Falcon Motors to Bank A, Bank C, Bank D, Bank E, and Lender 1.
In these PPP applications, defendant misrepresented, among other
things, the total number of employees and payroll expenses for
Falcon Motors.  In support of these applications, defendant also
submitted false and fraudulent documents, such as fake federal
payroll tax returns, payroll registers, and bank records.

    5.   Defendant used four different Employer Identification
Numbers ("EINs") in connection with the five PPP loan
applications he submitted in the name of Falcon Motors.  EIN 83-
094XXXX was issued by the IRS for Falcon Motors, Inc. in 2018,
the same year Falcon Motors, Inc. was incorporated.  The other
three EINs associated with "Falcon Motors" (Falcon Motors,
Falcon Motors Lux, and Falcon Motors Sales) used by defendant in
PPP loan applications were not issued by the IRS until April and
May 2020.  Defendant secured these three EINs from the IRS in

6



April and May 2020 in order to facilitate defendant's fraudulently obtaining multiple PPP loans for the same Falcon Motors used car business.

6.     Defendant certified in the PPP loan applications that he, as authorized representative of Falcon Motors and HK Development, knew and understood the terms and rules of the PPP loan program, which provided that PPP loan proceeds were to be used by the recipient to pay only certain authorized business expenses—such as payroll, mortgage interest, lease, and utilities.   Instead of using PPP loan proceeds for their stated and authorized business purposes consistent with PPP rules, defendant knowingly misapplied and used a substantial portion of the PPP loan proceeds for his own personal benefit, including sending hundreds of thousands of dollars in PPP loan proceeds to Uganda.

- *PPP Loan Funded by Bank C*

7.     In April 2020, defendant submitted to Bank C a PPP loan application dated April 30, 2020, signed by defendant, and supporting documentation, for a PPP loan to Falcon Motors in the amount of $420,000, for the stated purpose of paying payroll for Falcon Motors.   Defendant represented in the application that Falcon Motors was in operation on February 15, 2020, and had 26 employees for whom it paid salaries and payroll taxes, with an Average Monthly Payroll of $168,000.   In this application, defendant knowingly made the following false and fraudulent statements, among others:

7



H.K.

a.   Defendant falsely represented that applicant Falcon Motors had 26 employees and an average monthly payroll of $168,000, when, in fact, as defendant then knew, Falcon Motors had substantially fewer employees and a substantially lower payroll;

b.   Defendant falsely represented that applicant Falcon Motors was in operation as of February 15, 2020, and had employees for whom it paid salaries and payroll taxes using Employer Identification Number ("EIN") 85-080XXXX, when, in fact, as defendant then knew, EIN 85-080XXXX was not issued by the IRS until April 23, 2020, and the purported IRS Form SS-4 assigning EIN 85-080XXXX to Falcon Motors that defendant submitted to Bank C on April 24, 2020, was altered to show a false EIN issue date of April 23, 2018;

c.   Defendant falsely represented that applicant Falcon Motors with EIN 85-080XXXX had paid employees in 2019 a total of $2,022,300, as shown in a purported IRS Form 940 annual tax return for 2019, and had paid employees $504,000 during the first quarter of 2020, as shown in a purported Form 941 quarterly tax return, which tax return forms defendant submitted to Bank C as proof of payroll expenses paid by Falcon Motors, when, in fact, as defendant then knew, Falcon Motors had not paid such payroll expenses, and these tax return forms were fabricated and never filed with the IRS;

d.   Defendant falsely certified that Falcon Motors would not receive another loan under the PPP during 2020, when,

H.K.

in fact, as defendant then knew and concealed from Bank C, at the time of the PPP application to Bank C, defendant had previously submitted an active PPP application for Falcon Motors to Bank D.  Defendant also concealed from Bank C that, on the same day defendant submitted the PPP application to Bank C, defendant also signed and submitted a PPP application for Falcon Motors to Lender 1.

   e.  Defendant falsely certified that the funds sought in the PPP Application submitted to Bank C would be used to retain workers and maintain payroll or make mortgage-interest payments, lease payments, and utility payments, when, in fact, as defendant then knew, defendant intended to misapply and use the funds for purposes unrelated to Falcon Motors, including sending a substantial portion of the funds to Uganda.

  8.  In reliance on defendant's material false and fraudulent statements and his concealment of material facts, Bank C Bank approved and funded a $420,000 PPP loan to Falcon Motors.  Defendant caused Bank C to transmit on May 8, 2020, by means of wire communications in interstate commerce, approximately $420,000 from an account maintained by Bank C in Salt Lake City, Utah, to the Falcon Motors Bank A Account.

- *PPP Loan Funded by Bank D*

  9.  In April 2020, defendant submitted a PPP application dated April 6, 2020, signed by defendant, and supporting documentation, for a PPP loan in the amount of $137,500 for Falcon Motors.

9



H.K.

10.  Defendant falsely represented in the PPP loan application that Falcon Motors had five employees and monthly payroll of $55,100, when, in fact, defendant knew that Falcon Motors had substantially fewer employees and a substantially lower payroll.  In support of this application, defendant submitted a payroll summary report that falsely represented that for the period of March 28, 2019, to March 27, 2020, Falcon Motors paid employees $661,200, and paid federal withholding and FICA tax of $151,874.90.  Defendant also submitted as support three fabricated bank account statements for December 2019, January 2020, and February 2020, that substantially inflated the amount of funds in the Falcon Motors Bank A Account.  For example, the fabricated January 2020 account statement showed an ending balance of $84,862.82, when the actual ending balance of the Falcon Motors Bank A account in January 2020 was $284.82.

11.  In reliance on defendant's material false and fraudulent statements and his concealment of material facts, Bank D Bank approved and funded the $137,500 PPP loan to Falcon Motors.  Defendant caused Bank D to transfer on May 6, 2020, approximately $137,500 from an account maintained by Bank D to the Falcon Motors Bank A Account.

- *PPP Loan Funded by Lender 1*

12.  In April and May 2020, defendant submitted a PPP application dated April 30, 2020, signed by defendant, and supporting documentation, for a PPP loan in the amount of $346,300 for Falcon Motors.



H.K.

13.   In the PPP application, defendant falsely represented that Falcon Motors had 18 employees and a monthly payroll of $138,520, when, in fact, defendant knew that Falcon Motors had substantially fewer employees and a substantially lower payroll. In support of this application, defendant submitted a fabricated IRS Form 940 for Falcon Motors that reported Falcon Motors paid $1,662,240 to its employees in 2019, using EIN 85-083XXXX.  This EIN, however, was issued by the IRS on April 27, 2020 (i.e., three days before the date of the PPP application), and this 2019 Form 940 was never filed with the IRS.  Defendant also submitted a fake Payroll Register Report for Falcon Motors that falsely listed 19 employees (including defendant), with a total payroll of $415,560 for first quarter 2020.

14.   In reliance on defendant's material false and fraudulent statements and his concealment of material facts, Lender 1 approved and funded the $346,300 PPP loan to Falcon Motors.  Defendant caused Lender 1 on May 12, 2020, to transfer approximately $346,300 from an account maintained by Lender 1 to the Falcon Motors Bank A Account.

Declined Falcon Motors PPP Loan Applications

15.   In addition to the three funded loans, defendant submitted two PPP loan applications on behalf of Falcon Motors that were declined by lenders.  The first was an application, dated April 7, 2020, submitted to Bank A for a PPP loan for Falcon Motors in the amount of $145,000.  In this application, defendant falsely represented that Falcon Motors had eight

11


H.K.

employees and an average monthly payroll of $58,000.  In support, defendant submitted a fabricated IRS Form 941 that falsely reported Falcon Motors employees were paid $168,500 in compensation during the first quarter of 2020.

16.  The second was an application, dated May 8, 2020, submitted to Bank E for a PPP loan for Falcon Motors in the amount of $473,125.  In this application, defendant falsely represented that Falcon Motors had 28 employees and an average monthly payroll of $189,250.  In support, defendant submitted a fabricated 2019 IRS Form 940 for Falcon Motors, using EIN 85-094XXXX.  This EIN, however, was issued by the IRS on May 6, 2020 (i.e., approximately two days prior to the submission of the application).  Defendant also submitted a fake Payroll Register Report for Falcon Motors that falsely listed 28 employees (including defendant) for first quarter 2020.

17.  Defendant's submission of these false and fraudulent Falcon Motors PPP loan applications to Bank A and Bank E did not result in actual fraud loss, because the applications were declined by the lenders.  The $473,125 PPP loan application to Bank E constitutes intended fraud loss by defendant, because it was monetary harm that defendant purposely sought to inflict on Bank E.

Funded HK Development PPP Loan Application

18.  In April 2020, defendant submitted to Bank C a PPP application dated April 11, 2020, signed by defendant, and supporting documentation, for a PPP loan in the amount of

12



$98,750 for HK Development, for the stated purpose of paying payroll for HK Development.

19.   Defendant falsely represented in this PPP loan application that HK Development had eight employees and an average monthly payroll of $44,080, when, in fact, defendant knew that HK Development had substantially fewer employees and a substantially lower payroll.  In support of his application, defendant submitted a fake "Payroll Summary Report" that falsely reported $528,960 gross pay for HK Development employees between March 28, 2019, and March 27, 2020.

20.   In reliance on defendant's material false and fraudulent statements and his concealment of material facts, Bank C approved and funded the $98,750 PPP loan to HK Development.  Defendant caused Bank C on April 20, 2020, to transfer approximately $98,750 to the defendant's Bank B Account.

21.   Defendant did not use the PPP proceeds for payroll or other business purposes related to HK Development.  For example, after receiving the loan proceeds, defendant made an $18,000 payment to "ABS Finance" and a $13,000 payment to "AAAG California LLC AIM Vehicle," both of which are auto companies with which Falcon Motors did business.  Defendant also wired $5,000 to an account in Uganda.

Funded EIDL Applications

22.   On April 6, 2020, defendant signed and submitted to the SBA an EIDL application for a $150,000 loan to Falcon

13

H.K.

Motors.   In this application, defendant falsely represented that Falcon Motors had gross revenues of $3,685,100 and costs of goods sold of $2,765,450, for the period between January 31, 2019, and January 31, 2020, when, in fact, as defendant then knew, gross revenues and costs of goods sold for this period were substantially less.

23.   In reliance on defendant's material false and fraudulent statements and his concealment of material facts, the SBA approved and funded the $150,000 EIDL to Falcon Motors. Defendant caused the SBA on June 9, 2020, to transfer approximately $150,000 to the Falcon Motors Bank A Account.

24.   On June 15, 2020, defendant signed and submitted to the SBA an EIDL application for a $150,000 loan for HK Development.   In this application, defendant falsely represented that HK Development had gross revenues of $1,600,000 and costs of goods sold of $820,000, for the period between January 31, 2019, and January 31, 2020, when, in fact, as defendant then knew, gross revenues and costs of goods sold for this period were substantially less.

25.   In reliance on defendant's material false and fraudulent statements and his concealment of material facts, the SBA approved and funded the $150,000 EIDL to HK Development. Defendant caused the SBA on June 22, 2020 to transfer approximately $150,000 to defendant's Bank B Account.

14

H.K.

Transfers of Loan Funds to Uganda

26.   Defendant caused approximately $1,053,800 in PPP loans and EIDL funds to be deposited into the Falcon Motors Bank A Account between May 6, 2020, and June 9, 2020, as described above.   Defendant misapplied a substantial portion of these PPP loan proceeds for his own personal use and benefit, and transferred most of these funds offshore, to a bank account in his home country of Uganda.   Specifically, between May 7, 2020, and June 22, 2020, defendant made numerous online international wire transfers totaling approximately $762,000 from the Falcon Motors Bank A Account to Equity Bank Uganda Ltd in Kampala, Uganda, for the benefit of an entity in the name of defendant's father, which transfers were typically described in bank account statements as "construction funding investments."   Defendant knew his transfers of these funds to an offshore entity had no business purpose related to the operation of Falcon Motors, and were made in violation of the terms of the PPP loan program and EIDL program.

Actual and Intended Fraud Losses

27.   In sum, defendant's submission of false and fraudulent PPP loan and EIDL applications caused the victim lenders and the SBA to sustain the following actual fraud losses, which total approximately $1,302,550:

- Bank C: loss of $420,000 on its PPP loan to Falcon Motors;


H.K.

- Bank C: loss of $98,750 on its PPP loan to HK Development;

- Bank D: loss of $137,500 on its PPP loan to Falcon Motors;

- Lender 1: loss of $346,300 on its PPP loan to Falcon Motors;

- SBA: loss of $150,000 on its EIDL to Falcon Motors; and

- SBA: loss of $150,000 on its EIDL to HK Development.

28.  In addition, defendant's declined false and fraudulent loan application submitted to Bank E for a PPP loan to Falcon Motors constitutes an intended fraud loss of $473,125. Defendant's total combined actual and intended fraud losses is therefore $1,775,675.

***

I have read this STATEMENT OF FACTS IN SUPPORT OF DEFENDANT HASSAN KANYIKE's PLEA AGREEMENT AND INFORMATION in its entirety, and signed my initials at the lower right corner of each page to confirm that.  I have had enough time to review and consider this statement of facts, and I have carefully and thoroughly discussed every part of it with my attorney.  I agree that this statement of facts is sufficient to support a plea of guilty to the charge described in the plea agreement and to establish the Sentencing Guidelines factors set forth in paragraph 16 of the

///

///

16

H.K.

plea agreement.

_____                    02/22/2021
HASSAN KANYIKE                                      _____
                                                   Date


I am HASSAN KANYIKE's attorney.  I have carefully and thoroughly
discussed every part of this statement of facts with my client
and agree that it is sufficient to support a plea of guilty to
the charge described in the plea agreement and to establish the
Sentencing Guidelines factors set forth in paragraph 16 of the
plea agreement.

_____                    _____
VICTOR SHERMAN                                     Date
Attorney for Defendant
HASSAN KANYIKE


17

H.K.

### CERTIFICATE OF SERVICE

I, **Simonia White**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

### PLEA AGREEMENT FOR DEFENDANT HASSAN KANYIKE

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☒ Via email, as follows:
victor@victorsherman.law
lori@victorsherman.law

☐ By Federal Express, as follows:

This Certificate is executed on **February 24, 2021**, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

*Simonia White*
Simonia White
Legal Assistant